Jewell Ridge Coal Corporation v. Commissioner.
Jewell Ridge Coal Corp. v. Commissioner
Docket No. 78084.
United States Tax Court
T.C. Memo 1962-194; 1962 Tax Ct. Memo LEXIS 116; 21 T.C.M. (CCH) 1048; T.C.M. (RIA) 62194; August 15, 1962
Robert K. Eifler, Esq., and Charles W. Schoeneman, Esq., for the petitioner. W. Ralph Musgrove, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioner's income tax for the taxable year 1953 in the amount of $128,118.62. The disputed portion of this deficiency results from respondent's disallowance of deductions for losses resulting from an alleged debt which petitioner claims became partially worthless during the calendar year 1953 and petitioner's investment in some railroad stock which petitioner contends became wholly worthless during the same year. Findings of Fact Some of the facts in this case have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein and made a part of these findings *117 by this reference. Jewell Ridge Coal Corporation, sometimes hereinafter referred to as the petitioner, is a corporation organized under the laws of Virginia in 1910. Petitioner's principal office is located in Tazewell, Virginia, and its income tax return for the calendar year 1953 was filed with the district director of internal revenue at Richmond, Virginia. Since its incorporation petitioner has engaged in the mining of bituminous coal, primarily in Virginia, West Virginia, and Kentucky. At all times material herein Huston St. Clair, sometimes hereinafter referred to as St. Clair, was petitioner's president, and he and his immediate family owned 17.1 percent of petitioner's outstanding capital stock, all of which was common stock. St. Clair's sisters - Margaret St. Clair Moore and Kathryn St. Clair Santori - and their families owned 22.3 percent and 17.8 percent, respectively, and the Righter family, unrelated to the St. Clairs but descendants of one of petitioner's founders, owned 22.6 percent of petitioner's outstanding capital stock. The remainder of petitioner's stock was held by 33 other apparently unrelated stockholders. The Moore and Santori families were economically *118 independent of St. Clair and occasionally sought independent advice pertaining to their interests in petitioner. Other than token Christmas gifts, the Moore, Santori, and St. Clair families did not make gifts to one another. From 1946 and continuing until sometime in 1950 petitioner was managed by a board consisting of 11 directors, 4 of whom represented the Righter family, 3 the Moore family, 1 the Santori family, 1 the St. Clair family, and the remaining 2 directors were employees of petitioner. From 1950 and continuing through 1953 petitioner was managed by a board of 5 directors, 2 of whom represented the Righter family while the Moore, Santori, and St. Clair families were represented by 1 director each. St. Clair did not at any time control the vote of any other director. Sometime prior to August 1945 petitioner became interested in the possibility of establishing a coal mine and developing the coal reserves located in Scott and Fentress counties, Tennessee, and in August 1945 its general manager of operations was sent to investigate the coal-bearing lands in the vicinity of the towns of Oneida and Jamestown, Tennessee. He reported that the coal in this area was of a high *119 quality and that some 26,000 acres of coal land were available along the Oneida & Western Railroad, sometimes hereinafter referred to as the O. & W. or the railroad. Mines already in operation and working the same seams of coal could produce as much as 4,000 tons of coal per day and only the lack of aggressiveness on the part of O. & W.'s management was reported to be responsible for the nondevelopment of the coal reserves adjacent to the railroad. The O. & W. was incorporated in 1912 as the Jamestown Railroad Company under the laws of the State of Tennessee. Its name was changed to the Oneida & Western Railroad Company in 1913. The original promoters of the railroad were interested in using it to haul lumber products. It was approximately 37 miles long. One terminus was a town of approximately 2,000 population and the other had a population of about 1,000. Its only connection was at one end with the Southern Railway Co. By the late 1930's most of the original timber was gone and the railroad was no longer profitable. During 11 months of 1937 the O. & W. had a net income of $25,433.64. In December 1937 it declared a dividend of 2 1/2 percent of which $2.50 was paid in cash on *120 its qualifying shares and $18,732.50 was paid to the holder of 7,493 shares in the form of a note payable in 3 years. In 1940 this note was renewed and was still outstanding at the sale of O. & W. to petitioner, later described herein. For the years 1938, 1939, and 1940 its net losses were $10,897.56, $2,413.72, and $1,971.28. In 1939 it borrowed $5,000 from a Cincinnati bank to pay 1938 taxes and in 1940 it again borrowed $5,000 from the bank to pay 1939 taxes. By the end of 1941 it was indebted to the bank in the total amount of $15,000, represented by notes payable to the bank, of which $10,000 was secured by a mortgage on two of its locomotives. At the end of 1938 O. & W. had current assets of $17,841.48 (including "Material & Supplies" in the sum of $11,147.91) and current liabilities in the sum of $23,522.99. At the end of 1939 it had current assets in the sum of $13,352.93 (including "Material & Supplies" in the sum of $10,674.20) and current liabilities in the sum of $33,119.72. At the end of 1940 it had current assets in the sum of $17,006.22 (including "Material & Supplies" in the sum of $8,144.27) and current liabilities in the sum of $43,720.23. During the years 1938, 1939, *121 and 1940 O. & W. had undepreciated investments in "Road & Equipment" in excess of $800,000 and no long-term debt. Sometime in February 1942 Irving Crown, Michael S. Healy, and James R. Healy acquired all of O. & W.'s outstanding capital stock. Irving Crown was the president and principal stockholder of a building supply firm known as Material Service Corporation, hereinafter referred to as Material Service. The Healys were engaged in the construction business under the name of S. A. Healy Company. The interest of these men in the O. & W. stemmed from the award to S. A. Healy Company of the contract to construct the Wolf Creek Dam across the Cumberland River for the United States Corps of Engineers for which Material Service was to supply cement and other construction materials, to be hauled over the O. & W. to the construction site of the dam. It was considered by them that a considerable profit would be made by the O. & W. as a result of this traffic. Construction of the Wolf Creek Dam was suspended during World War II, and during that period the O. & W.'s owners made no effort to improve its traffic. The stockholders and directors met annually in Chicago, Illinois, to receive *122 annual reports on the O. & W.'s financial affairs and to elect directors and officers, but no other business was transacted. The railroad was maintained in an operating condition safe enough to handle the existing traffic, despite operating losses which averaged $20,000 per year for the years 1942 through 1946. From February 28, 1942, to May 23, 1946, Material Service and one Benjamin Z. Gould advanced to the O. & W. a net amount of $86,535.46, which was recorded on O. & W.'s books of account as accounts payable by O. & W. "to Affiliated Companies." [1]
As of July 31, 1946, the books of O. & W. show that it had the following assets and liabilities: ASSETS
Current Assets: Cash
$ 118.21
Notes and accounts re-
ceivable
2,179.68
Supplies and materials
8,798.26
Total Current Assets
$ 11,096.15
Investments: Roadway and equip-
ment
$920,396.90
Less: Reserves for de-
preciation
97,746.50
Net Depreciable As-
sets
$822,650.40
Oneida Machinery Com-
pany (100%)
13,282.49
Total Investments
835,932.89
Prepaid expenses
392.45
Total Assets
$847,421.49
LIABILITIES AND NET WORTH
Current Liabilities: Accounts payable
$ 5,398.46
Accrued taxes
4,403.01
Total Current Liabilities
$ 9,801.47
Amounts Payable to Affiliated Com-
panies: Notes payable
$ 33,732.50
Accounts payable
86,535.46
Interest accrued
$ 6,937.17
Total Amounts Payable to Affil-
iated Companies
$127,205.13
Total Liabilities
$137,006.60
Net Worth: Capital stock
$550,000.00
Other earned surplus
9,342.76
Donations and grants
48,125.72
Earned surplus
102,946.71
Total Net Worth
710,414.89
Total Liabilities and Net Worth
$847,421.49
*123 In July 1946 the scrap or salvage value of the railroad was $150,000. While investigating the prospects of establishing a coal mine in Tennessee, St. Clair learned that the O. & W.'s owners had failed to receive the contract to build the Wolf Creek Dam upon the submission of new bids after the war, and as a consequence they had applied to the Interstate Commerce Commission, sometimes hereinafter referred to as the Commission, for permission to abandon the railroad. In August 1946 petitioner's officers and engineers had decided to install a coal mine in the vicinity of the O. & W., and it was also known that the construction materials for the dam would have to be hauled over the O. & W. St. Clair formed the opinion that the O. & W. could be profitably operated and that opinion, together with the Interstate Commission's requirement that the owners sell the railroad to any responsible person willing to operate the railroad for a price not less than the salvage value, prompted St. Clair to persuade petitioner's directors to acquire the railroad. St. Clair engaged a Tennessee attorney named Howard Baker, hereinafter referred to as Baker, to represent him in negotiating for the purchase *124 of the railroad. At that time the railroad's monthly operating revenues totaled about $11,000 while expenses, including depreciation, totaled about $9,500. Tax accruals and other items, excluding interest, totaled about $1,400 per month. At this level of operation it was anticipated that the O. & W. could repay approximately $7,000 of its debt each year as a result of the cash flow resulting from the depreciation charges. St. Clair employed the O. & W.'s superintendent to prepare a report detailing the revenue and expenses anticipated from the increased traffic. It was estimated that the O. & W. would have a minimum net profit after depreciation of $75,000 during the 2 years the dam was under construction and $50,000 a year thereafter from the operation of petitioner's projected coal mine. It was also reported that the O. & W. would require an estimated $37,500 to repair the approach to one of its bridges, to replace worn ties and rails, and to supply working capital until the cement haulage began. Baker began negotiations with the O. & W.'s owners in August 1946 directed toward a purchase on behalf of petitioner of about 6,000 acres of coal lands as well as the railroad's debt *125 and outstanding capital stock. As already indicated, the owners of O. & W. had decided to liquidate their interests in O. & W. and a salvage value had been placed upon this property by appraisement at $150,000. However, if a bid of at least that amount were made by a person interested in maintaining an operating railroad, they were obligated by law to sell to such bidder rather than scrap the railroad. Baker, on behalf of petitioner, was able to effect a deal with the O. & W. stockholders whereby petitioner was to acquire the railroad plus approximately 6,000 acres of adjacent coal land owned by the Crown and Healy interests for $150,000 in cash. The transaction was to and did take the form of the purchase by petitioner of the coal land for $17,500, the purchase of all of O. & W.'s indebtedness at its face amount of $127,322.10, and of all of O. & W.'s stock (7,500 shares) for $5,177.90. St. Clair had obtained the approval of these terms by a majority of petitioner's directors on or before September 6, 1946. On September 27, 1946, petitioner's full board of directors met and was presented with the available information regarding the O. & W.'s financial position and history, including *126 past and prospective earnings, outstanding debt, value of assets, and capital requirements. At that time St. Clair reported that the O. & W. had a value of $400,000 to $500,000 as an operating railroad. Petitioner's directors approved the purchase terms, and at St. Clair's suggestion authorized St. Clair and John Routh, or their nominees, who had been responsible for bringing the transaction to petitioner's attention, to purchase one-third of the O. & W. stock at 69 cents per share. At the same meeting $150,000 was appropriated to locate and install a coal mine on the property acquired from the O. & W. A loan of $37,500 to the O. & W. was also authorized for making the needed repairs and to provide a small amount of working capital until the expected increase in the railroad's revenue occurred. This advance of $37,500 was evidenced by certain demand notes payable at the Farmers Bank of Clinch Valley of Tazewell, Virginia, with interest at 3 percent per annum. Petitioner and O. & W. verbally agreed that no interest would be paid thereon until after the principal amount had been repaid. Petitioner did not accrue the deferred interest on its books of account, but O. & W. accrued it *127 in an account labeled "Fixed interest not in default." A number of circumstances combined to make petitioner's investment in the O. & W. an unprofitable undertaking. Initially, the cost of excavating and pouring new footings for the approach to the bridge over the south fork of the Cumberland River substantially exceeded the engineer's original estimate. The cement haulage to the site of the Wolf Creek Dam was delayed until about April 1, 1947, and instead of being concentrated within a 2-year period, it was eventually spread over 4 years. A major flood on the Cumberland River during the winter of 1947-1948 and a labor strike in early 1949 contributed to the delay in the construction work on the Wolf Creek Dam. Petitioner's coal mine, which was located at Zenith, Tennessee, and which was expected to produce a minimum of 2,000 tons of coal a day, was put into production about November 1, 1948, but 6 months later unusual roof conditions were encountered which proved an insurmountable obstacle to continued mining operations. The cost of operating the mine became so great that it was abandoned in the first half of 1949. To provide the railroad with the funds needed to continue its *128 operations in the face of the foregoing setbacks, petitioner advanced to O. & W. $27,000 in February 1947, another $4,000 in March, and an additional $5,000 in April 1947. Petitioner's board of directors called upon St. Clair to substantiate each advance before it was granted. These advances were evidenced by 3 percent demand notes and contemporaneously recorded on the books of each corporation as a debt owed by O. & W. to petitioner. Between May 1947 and September 1949 petitioner made only two advances to O. & W. - $5,000 in February 1948 and $5,000 in February 1949 - to enable the railroad to pay its Tennessee state taxes. In both instances temporary shortages of cash caused by the delay in cement shipments resulting from the aforementioned flood in 1948 and labor strike in 1949 prompted the advances made by petitioner. After having suffered net losses after fixed charges of $30,883 in 1946 and $12,695 in 1947, the O. & W. realized a net profit of $15,858 in 1948. Beginning in July 1948 and continuing through November 1948 the railroad made payments in the total amount of $23,000 toward the reduction of its alleged indebtedness to petitioner. Both corporations treated these transactions *129 as repayments of loans on their respective books. At the end of the year 1948 O. & W.'s total book debt to petitioner was $182,822.10. This figure includes the $127,322.10 petitioner paid in 1946 to acquire certain notes and outstanding accounts payable. After abandoning its mine at Zenith in 1949 petitioner's board of directors became concerned about protecting its interests in O. & W. and the possibility of additional sources of traffic for the railroad was investigated. Among these sources were the Tennessee Valley Authority's anticipated increased purchases of coal at Jamestown for shipment over the O. & W.; the expected increase in the production of a limestone quarry by the Frogge-Williams Company near the O. & W.; the possibility of developing pulpwood, barite, crab-orchard stone, and sand as additional sources of freight revenue; the building of still another dam across the Cumberland River adjacent to the O. & W.; a project for the establishment of a shirt factory at Jamestown; and the possibility of building an electric furnace steel mill at Oneida. Petitioner's directors concluded that they would give the railroad sufficient time to develop additional sources of revenue. *130 From September 1949 through December 1950 petitioner made advances to O. & W. totaling $23,500, consisting of $5,000 in September 1949, $5,000 in November 1949, $7,500 in May 1950, and $6,000 in October 1950. These advances were also evidenced by 3 percent demand notes and recorded on the books of each corporation. These advances increased O. & W.'s book indebtedness to petitioner from $187,822.10 to $211,322.10. St. Clair took a personal interest in the formation of a corporation to construct and operate an electric furnace steel mill to be located on the O. & W. On December 8, 1950, the Tennessee Steel Corporation, sometimes hereinafter referred to as Tennessee Steel, was incorporated under the laws of Tennessee, and St. Clair and two other backers invested approximately $100,000 in its stock, each owning a one-third interest in the corporation. Engineering studies of the proposed steel mill were made by Piper Engineering Company of Pittsburgh, Pennsylvania, and plans, designs, and specifications for construction of the steel mill were prepared, estimates of costs were made, and assurances were received from some Chicago underwriters that commercial financing of the mill could *131 be arranged, provided the Government would issue a certificate of necessity to permit the construction materials to be obtained. Tennessee Steel applied to the Defense Production Administration for such a certificate on January 19, 1951, and it was granted on May 14, 1951. Due to changes in the so-called money market in 1951, occasioned by the Korean War, the Chicago underwriters were no longer willing to underwrite the entire cost of the steel mill, but they did agree to underwrite approximately $3,250,000 of Tennessee Steel's financing if the Federal Government would lend, through the Reconstruction Finance Corporation, the remaining $9,000,000 it was estimated would be needed to establish the plant. Tennessee Steel applied for such a loan, and both Tennessee senators, the Tennessee Valley Authority, and a number of people in the defense mobilization lending agencies of the Federal Government supported Tennessee Steel's application. Petitioner gave Tennessee Steel an option to purchase a plant site adjacent to the O. & W. right-of-way as well as all of the O. & W. stock and "debt" held by petitioner. The terms of the option called for purchase within 60 to 120 days at a price *132 of $395,000. All of the O. & W. stockholders, except Howard Baker, agreed to sell their stock in the O. & W. as a part of the option. Baker had been elected to Congress, and to avoid any possibility of a conflict in interest resulting from Tennessee Steel's application for a Federal loan and in order to make his services in Washington to petitioner with regard to this application more effective he and petitioner agreed that petitioner would buy his 200 shares of O. & W. stock on August 23, 1951, for $4,400, or $22 a share. This price was based upon the option price of $395,000, less liabilities, divided by the number of shares of stock outstanding. Tennessee Steel's application for a Federal loan was made under section 302 of the Defense Production Act of 1950. On September 20, 1951, this application was referred to the Defense Production Administration. On October 1, 1951, in support of its application, a pro-forma earning statement was filed with the Reconstruction Finance Corporation. The Defense Production Administration declined to issue a certificate of essentiality, without which the application for a Government loan could not by that time be approved under that section as *133 amended by Executive order. This decision was appealed to Charles E. Wilson, Head of the Office of Defense Mobilization. He advised the representatives of Tennessee Steel that they should transfer their application for a loan to the Small Defense Plants Administration, an adjunct of the Reconstruction Finance Corporation, where a certificate of essentiality would not be required. At the same time these governmental procedures were being pursued, Tennessee Steel employed a general manager for its proposed steel mill and retained the Koppers Company to study and report upon its plan for an electric furnace steel mill. When completed, the Koppers Company's report was forwarded to the loan agency. Petitioner extended the option to purchase the O. & W. "debt" and stock for 6 months in April 1952, and in May 1952 Tennessee Steel's loan application was forwarded to the field office of the Small Defense Plants Administration at Atlanta, Georgia, for investigation. Conferences were held in Atlanta between Tennessee Steel officials and the field investigators, and an inspection of the plant site was conducted in June 1952. In July 1952 the Small Defense Plant Administration notified Tennessee *134 Steel that its plans for construction of the steel mill had not been perfected and that it could not recommend favorable consideration of the loan application. Tennessee Steel unsuccessfully attempted to appeal this decision. With petitioner's permission Tennessee Steel then attempted to interest Bethlehem Steel Corporation in taking over its position and building a steel mill adjacent to the O. & W. right-of-way. Bethlehem Steel considered the matter for several months, but it declined to build the mill. Thus, by January 1953 petitioner's board of directors concluded that the steel mill could not be built and that the O. & W. railroad should be abandoned. From January 1951 to July 1952 petitioner hoped that a steel mill would be constructed at Oneida, and that, if the O. & W. could be sustained until financing was obtained by Tennessee Steel, all of its advances to the O. & W. would be collected. During this period additional amounts were advanced to O. & W. as follows January, 1951
$ 7,500
June, 1951
12,000
August, 1951
11,000
October, 1951
9,000
January, 1952
15,000
March, 1952
12,000
May, 1952
12,000
June, 1952
5,000
July, 1952
7,000 These *135 advances were evidenced by 3 percent demand notes and recorded as debts owed to petitioner by O. & W. on the books of the two corporations. After July 1952 it was apparent to petitioner that the O. & W. could not become self-sustaining, and the possibility of selling the railroad except for its scrap value was remote. Between August 1952 and January 1953 petitioner advanced the O. & W. a total of $33,000 as follows: $5,000 in August 1952; $8,000 in October 1952; $10,000 in December 1952; and $10,000 in January 1953. Each advance was evidenced by a 3 percent demand note and recorded on the books of the two corporations as an indebtedness owed by O. & W. to petitioner. In February 1953 petitioner initiated abandonment proceedings before the Interstate Commerce Commission in which the other O. & W. stockholders acquiesced. A preliminary hearing was scheduled before an examiner from the Commission on June 10, 1953, and the examiner's report, filed in October 1953, recommended that a certificate of abandonment be issued. The final decision of the Commission, confirming the examiner's report, was entered on January 20, 1954, from which date a 40-day period began running during which *136 any responsible person wishing to continue operating the railroad could acquire it for its salvage value. Thereafter, assuming no such person came forward, the Commission's decision became final and the railroad would cease to operate. In order to expedite the abandonment proceeding, petitioner assumed the responsibility for payment of wages, taxes, and miscellaneous accounts of the O. & W. During this period and for the foregoing purposes petitioner advanced O. & W. funds in the total amount of $48,000 in order to maintain a minimum operation of the railroad. These advances were made between February and December 1953, and each was evidenced by a 3 percent demand note, which were again recorded on the books of both corporations as debts owed to petitioner by O. & W. The following schedule summarizes the O. & W.'s current assets, current liabilities, and the amounts payable to affiliated companies as of December 31 of the years indicated, as well as the net income after fixed charges [2] for the same years: Net
Current
Amounts Payable to
Income After
Year
Current Assets
Liabilities
Affiliated Companies
Fixed Charges
1946
$23,538
$11,233
$147,864
($30,883)
1947
22,497
20,531
204,751
(12,695)
1948
25,342
18,812
190,225
15,858
1949
24,507
22,637
208,530
(30,576)
1950
14,391
23,223
225,673
(35,658)
1951
2,973
17,658
270,847
(61,783)
1952
6,554
15,854
351,177
(82,603)
*137 As of the beginning of business December 31, 1953, after the making of the aforementioned advances, O. & W.'s book indebtedness to petitioner totaled $384,025.60. [3] This amount did not include any accrued interest. Petitioner estimated that the net recoverable value upon the salvage of O. & W. assets would be $152,359. Sometime in December 1953 petitioner charged off its books as of December 31, 1953, $231,666.60 of this amount as a worthless debt, leaving $152,359 outstanding, which amount represented petitioner's expected recovery upon completion of the salvage operation. *138 In 1954, after the certificate of abandonment issued by the Interstate Commerce Commission had become final, O. & W. sold its assets, paid all of its debts and the expenses of the salvage operation, and applied the net proceeds amounting to $159,330.18 toward payment of its alleged debt to petitioner. Petitioner reported as ordinary income the $6,971.18 by which the payments actually received exceeded the "indebtedness" not already charged off as worthless on its Federal income tax return for the taxable year 1954. At the time petitioner acquired the O. & W. it was apparent that the railroad would require additional capital in order to operate and develop additional sources of revenue. The only likely source of additional capital was by way of advances from petitioner to the railroad. The O. & W. applied for no loans from any other source after it was acquired by petitioner. Opinion KERN, Judge: The more important question herein (both in difficulty of solution and in amount of taxes involved) is whether certain "debts" purportedly owed to petitioner by the O. & W. Railroad were in reality debts or were capital expenditures and contributions made by petitioner. This question *139 is essentially a question of fact and the burden of proving that these debts constituted valid indebtedness of O. & W. to petitioner is upon petitioner. . Basically, the problem is whether the amounts represented by the purported indebtedness have been put at the risk of the corporate venture and thus represent an equity investment or whether they have been paid or advanced with the genuine and reasonable expectation that they will be repaid at a certain time in all events and regardless of the earnings of profits by the corporation and are thus valid indebtedness. See ; , reversing ; . The problem has been discussed and various criteria have been suggested for its solution in many additional cases, among which are , affd. ; , affd. ; , affd. ; , *140 affd. ; and . Of the purported indebtedness of O. & W. claimed by petitioner as a deduction in the taxable year $127,322.10 represents the outstanding "indebtedness" of O. & W. "purchased" by petitioner as a part of the transaction whereby petitioner acquired ownership of the O. & W. The record herein indicates to us that in reality the crux of the bargain was that the former owners of O. & W. were to get and petitioner was to pay the approximate salvage value of the railroad. The method by which this was accomplished was the purchase of certain coal land for $17,500 and the payment of $132,500 for the railroad. The latter transaction was cast in the form of the purchase of $127,322.10 of O. & W.'s indebtedness and the payment of $5,177.90 ($132,500 minus $127,322.10) for its stock. We consider that in practical reality petitioner acquired the railroad by paying to or on behalf of its owners a total amount of $132,500, and in reality this sum represented petitioner's original cost of the railroad. The fact that the transaction was cast in a form which reflected an indebtedness of O. & W. to petitioner in the sum *141 of $127,322.10 and a stock investment of only $5,177.90 (resulting in an obviously thin capitalization of O. & W.) should be disregarded in considering the realities of the situation for tax purposes. See ; 1432 , affd. ; In our opinion the respondent did not err in disallowing the amount of $127,322.10 as a bad debt deduction. Neither do we think that respondent erred in disallowing the remainder of the bad debt deduction claimed herein which represented advances made to O. & W. by petitioner after it had acquired ownership of O. & W. The record shows that it was obvious from the start of petitioner's ownership of O. & W. (and even before) that O. & W. needed additional capital and the course of conduct indicates that petitioner understood that it would underwrite all of O. & W.'s financial requirements. There was never any effort made to borrow from outside sources. Petitioner understood that the repayment of the advances was to be made out of the profits of the railroad's operation. Petitioner's course of conduct indicates that its *142 attitude was one of an ordinary shareholder. No interest was ever paid on the advances regardless of the fact that notes evidencing the advances called for payment of interest and no interest is included in the deduction sought herein. When the railroad was finally liquidated there was no pro rata distribution to petitioner on its alleged debts together with other creditors, all of whom were paid in full. See ; . Of course petitioner hoped with reason, like many other investors, that the corporation in which it had invested would be profitable, and by reason of its profitable operation petitioner would soon recoup its investment. However, in our opinion, this differed from the reasonable certainty of repayment which is possessed by the ordinary lender of money who takes prudent safeguards to insure repayment and whose attitude is less optimistic than that of one who furnished risk capital. The remaining issue has to do with the year in which petitioner may take the capital loss to which it is clearly entitled. We have held that the payments made by petitioner in 1946 for the so-called purchase *143 of O. & W.'s debts constituted in reality a capital outlay incident to its acquisition of the ownership of O. & W. and should be considered as a part of its investment in the stock of O. & W. We have also held that the advances subsequently made by petitioner to O. & W. were in reality contributions to capital rather than loans. Consequently the amounts of such payments and advances must be considered as additional cost to petitioner of the O. & W. stock. See . Accordingly, in considering the question as to whether O. & W. was so hopelessly insolvent during the taxable year as to warrant a conclusion that its stock then became worthless rather than in the subsequent year when its actual liquidation took place, we cannot consider the purported indebtedness of O. & W. to petitioner as in reality indebtedness. To the contrary, we must consider the question on the assumption that as of December 31, 1953, petitioner owned stock of O. & W. which had a cost to it of $391,878.50, and that O. & W. had assets estimated by petitioner to have a salvage value of $152,359 and liabilities only in an inconsequential amount arising out of current operations. *144 Although it was more than apparent that O. & W. could not be profitably operated, the amount of the loss to be sustained by petitioner on its investment in the O. & W. stock could not be definitely ascertained until the assets were actually sold and the expenses of liquidation were paid. Since these events did not transpire until 1954, the petitioner is not entitled to a loss deduction as a result of its investment until that year. See , appeal dismissed . Decision will be entered for the respondent. Footnotes
1. Slightly less than half of this amount was advanced by Material Service and the balance was advanced by Gould, whose identity and relationship to Crown and the Healys are not disclosed by the record.↩
2. The fixed charges consisted of two interest items. The largest charge was in reality only an accounting entry on the account labeled "Fixed Interest Not In Default." The other item was interest on O. & W.'s unfunded debt.↩
3. The parties stipulated that the book indebtedness of the O. & W. to petitioner on December 31, 1953, was in the amount of $384,025.60. The sum obtained by adding the original $127,322.10 (which petitioner contends should be part of the debt) to the various advances and loans indicated by our findings and subtracting the repayment of $23,000 is $382,822.10. The discrepancy, amounting to $1,203.50, is nowhere explained in the record or on brief. We consider ourselves bound by the stipulation and we must therefore ignore this obvious inconsistency.↩